## MOBILE & O. R. CO. v. SCHNIPPER, County Collector of Taxes, et al.

District Court, E. D. Illinois. March 21, 1929.

No. 110–D.

Carl Fox, of St. Louis, Mo., and David S. Lansden, of Cairo, Ill., for plaintiff.

F. J. Tecklenburg, of Belleville, Ill., for defendants.

LINDLEY, District Judge. This is a bill in equity of the same character as that before the court in Wilson v. Illinois Southern Railway Co. et al., 263 U. S. 574, 44 S. Ct. 203, 68 L. Ed. 456. Plaintiff seeks to restrain the collection of alleged excessive assessed taxes for the year 1927 upon the track and rolling stock of that part of plaintiff's property located within or apportionable to the state of Illinois. The bill alleges that the property was erroneously and fraudulently overvalued, out of proportion to the other taxable property of the state, in violation of the Constitution of the state of Illinois (Const. 1870, art. 9, § 1), and of the Fourteenth Amendment of the Constitution of the United States; that the tax commission assessed the property at $6,797,999 in addition to local assessments of approximately $60,-000; that the said assessment amounts to the full value of plaintiff's property; that for a number of years there has been a practice throughout the state of assessing property upon the basis of not more than 40 per cent. of its fair cash value; that the commission, well knowing of this practice upon the part of the local taxing authorities, utterly disregarded it, so far as the plaintiff was concerned, and arbitrarily and fraudulently fixed the assessed value as aforesaid; that plaintiff has paid 50 per cent. of the assessment, and that such payment exceeds its proportionate share of taxes in Illinois. Defendants, tax collectors in each of the counties through which the railroad passes, deny these

allegations, except as to the amount of the assessment and the payments made.

The ultimate question with which the court is concerned is whether the property of the plaintiff has by the commission been overvalued erroneously and fraudulently and out of proportion to other property. To determine this question, the court must ascertain at what rate property generally in Illinois is assessed, at what rate plaintiff's property has been assessed, and whether such assessment is of such character as to amount to fraud.

Upon the question of the custom and practice as to assessments in general in Illinois, both parties introduced extensive evidence. For the plaintiff, Dr. Simpson, of the Institute of Research at Northwestern University; A. M. Banes, engaged solely in the investigation of tax assessments; R. A. Miller, tax commissioner of the Chicago & Northwestern Railway Company; and John C. Watson, for some years in charge of the department of taxation of the Illinois Agricultural Association—all widely experienced and fully advised upon the subject-matter, testified at length concerning tax assessments in Illinois. The detailed results of their examinations of the records and their calculations were introduced. They examined the records of conveyances in which the consideration was expressed in dollars quite generally throughout Illinois, including those of the counties through which the plaintiff's railroad extends. They obtained from the proper records the assessed value of each of the properties described in the respective conveyances of the recorders' offices in each county.

Their testimony was of the same character as that discussed and approved by the court in People v. C., B. & Q. R. R. Co., 300 Ill. at page 405, 133 N. E. 325. Their records are voluminous, and the court will not attempt to discuss in detail their testimony. Dr. Simpson confined his investigation to assessments in the city of Chicago, which he found to average 35.90 per cent. of the apparent full values. Mr. Banes confined his investigations to 24 counties, and found the average assessment to be 36.71 per cent.; Mr. Miller investigated assessments in 22 counties and found them to average 37.96 per cent.; Mr. Watson examined the records as to farm lands and city properties in 61 counties and found the average assessment to be 38.50 per cent. The Illinois state tax commission in 1920 reported that it had conducted a general and thorough investigation

as to the ratio of assessment of lands, and had found that assessments varied from as low as 30 per cent. of their value up to as high as 60 per cent. At that time it equalized assessments by reducing those assessed over 50 per cent. and raising those assessed under 40 per cent., so that, after equalization, all lands within the state were, according to its judgment, assessed at not less than 40 per cent. and not more than 50 per cent. of their actual value. The evidence fails to show that these percentages have been since increased in the state as a whole.

For defendants, Mr. Young, the assessor of Monroe county; Mr. Dewey, the recorder of Alexander county; Mr. Thorp, the county clerk of Jackson county; and Mr. Watson, assessor of Randolph county, furnished testimony similar to that of the witnesses for the plaintiff. Mr. Young said that the assessments in his county averaged 55.75 per cent., but upon cross-examination it was shown he had omitted numerous conveyances from his calculations. Mr. Dewey's examination covered only six-month periods in each of four years. For those periods the assessments averaged 54.9 per cent. But it appeared that, if he had continued his examination over the period ending April 1, 1927, his calculation would have run 52.38 per cent., and that, if he had included two conveyances which were omitted, his result for the latter year would have been 38.65 per cent. Mr. Thorp likewise confined his investigation to six-month periods, and arrived at a calculation of 63 per cent. He made no separate calculation for either 1926 or 1927. Mr. Watson confined his investigations to the years 1923 to 1925, and found an average assessment of 51.9 per cent. He did not investigate the 1927 assessment of lands, which the tax commission had reduced 15 per cent. in his county. Some other witnesses for the defendants testified that they had made no examination of the records, but that they had an opinion as to assessment of lands generally. Obviously such testimony is of little aid to the court in determining the actual facts.

The record discloses that no assessing authority in the state of Illinois attempts to comply with the law. The court, therefore, must determine as best it can the actual assessment of property in the state of Illinois for tax purposes. Extending to defendants every presumption in support of the acts of the commission, resolving in their favor every doubt in the record, from all the evidence offered the conclusion is inevitable that property generally in Illinois is assessed at

rates at the most not exceeding 47 per cent. of its actual value. The court finds itself strongly of the belief that assessments quite generally are much less, probably not in excess of 40 per cent.; but, in·view of the rule governing the court's limitations in reviewing the work of assessing bodies, it has adopted as beyond cavil a percentage of not to exceed 47 per cent. as fully inclusive of the maximum of assessments upon the properties of other taxpayers.

Having ascertained the maximum rate at which other property in the state of Illinois is assessed, it becomes necessary to determine whether the commission in making the assessment complained of wrongfully failed to adopt the same rule as to the plaintiff, and in violation of its constitutional rights assessed plaintiff's property at an excessively higher rate. The assessment of the state tax commission found the full value of all of plaintiff's property taxable in Illinois to be $6,797,999. It fixed the assessed value at the same amount. In its formal finding and assessment, therefore, the commission first determined the full value of plaintiff's property and then assessed it at 100 per cent. thereof. If the commission found the proper full value, then in order to follow the Constitution of Illinois, and in order to comply with the Fourteenth Amendment of the Constitution of the United States, in view of its general practice, and that of other assessing authorities, it was its duty to fix the assessed value at 47 per cent. thereof, or $3,195,049. In other words, if we adopt the commission's own figure, it has glaringly omitted to accord to the plaintiff its legal rights. The court would be warranted in disposing of this case without further consideration, upon the finding that, when the tax commission found the full value to be $6,797,999, it was bound to levy only such an assessment as was general in the state of Illinois, or not exceeding 47 per cent. thereof.

But the defendants now contend that the full value was in excess of that found by the commission, and the respective parties have offered voluminous testimony as to the value of that part of the plaintiff's property taxable within the state of Illinois. Both parties furnished evidence as to the market value of the outstanding securities issued by the plaintiff company; the net railway operating income of plaintiff for a number of years; the net operating income from the portions located in Illinois alone; the net cost of the railroad in 1913; the value of the property as determined by capitalization of the earnings generally, and in Illinois particularly, at various rates of interest; and otherwise as to the character and value of the specific property.

The facts are undisputed that the bonds and trust obligations of plaintiff are of the par value of $35,223,000; that 16.77 per cent. of mileage owned and 14.6 per cent. of the mileage operated by the company is located within Illinois; that the entire railroad extends from East St. Louis, Ill., to Mobile, Ala., and that it owns no terminal facilities at its northern terminus in Illinois. The evidence further shows that the average operating earnings of the company for the entire road for the period covering the years 1923, 1924, 1925, and 1926 is $3,318,712; that in those years that part of the railroad located in Illinois earned an average annual percentage thereof of 14.27 per cent.; that in 1927 the Illinois portion of the road earned 14.50 per cent. of the entire earnings; that the operating income in Illinois, after payment of Illinois taxes and rentals for the years 1923, 1924, 1925, and 1926, averaged $474,615; and that for the five-year period, beginning with 1922 and ending with 1926, the average operating income in Illinois was $372,111.

Eliminating all income other than operating income, we have an average net earning for the four-year period mentioned over the entire road of $3,197,262. If we capitalize this at 6 per cent., we have a value of $53,293,760. Such a capitalization basis is undoubtedly fair and reasonable. Under the statutes of the state of Illinois (Smith-Hurd Rev. St. 1927, c. 74, §§ 1–11) the legal rate of interest is 5 to 7 per cent. The courts have from time to time approved 7 per cent. as a reasonable earning upon public utility properties. Under the Interstate Commerce Law 6 per cent. is recognized as a fair return. Some of the bonds of plaintiff outstanding bear a smaller rate of interest, and defendants insist that the earning power of the railroad should be capitalized upon the basis of 4.9 per cent., which it calculates the present return upon the bonds to be, taking into consideration their present market value. The court does not conceive itself justified in capitalizing the income from the property owned over and above the bonds upon the same basis as upon the bonds themselves, secured by first mortgage upon the property. We should give recognition to the fact that interest upon first mortgage bonds is always less than that upon second mortgage bonds, or that upon equities over and above mortgages. The secured investor willingly accepts a smaller

return for his money than the unsecured investor or speculator.

Concerning values and proper basis for taxation the Supreme Court of the United States in Cleveland, C., C. & S. L. Ry. Co. v. Backus, 154 U. S. 439, 14 St. Ct. 1122, 38 L. Ed. 1041, said: "The rule of property taxation is that the value of the property is the basis of taxation. It does not mean a tax upon the earnings which the property makes, nor for the privilege of using the property, but rests solely upon the value. But the value of property results from the use to which it is put, and varies with the profitableness of that use, present and prospective, actual and anticipated. There is no pecuniary value outside of that which results from such use. The amount and profitable character of such use determines the value, and if property is taxed at its actual cash value it is taxed upon something which is created by the uses to which it is put."

In considering the value of the property in Illinois it should be observed that section 45 of the General Revenue Act of the state of Illinois (Smith-Hurd Rev. St. 1927, c. 120, § 49) provides that rolling stock of the railroad shall be listed and taxed in the several counties in the proportion that the length of the main track used and operated in such county bears to the whole length of the road used or operated by such person, whether owned or leased by it in whole or in part. From the record of the commission it appears that the state tax commission, in determining the value of the rolling stock taxable in Illinois, adopted the figure of 14.6 per cent. hereinbefore mentioned. In Fargo v. Hart, 193 U. S. 490, 24 S. Ct. 498, 48 L. Ed. 761, the Supreme Court approved a mileage proportion, and said: "So long as it fairly may be assumed that the different parts of a line are about equal in value, a division of mileage is justifiable. But it is recognized in the cases that if, for instance, a railroad company had terminals in one state equal in value to all the rest of a line through another, the latter state could not make use of the unity of the road to equalize the value of every mile. That would be taxing property outside of the state under a pretense." The undisputed testimony here is that there are no special circumstances which would justify a higher assessment per mile in Illinois than in any other state, but that the expense of operation in Illinois is greater than in the other states, because of more excessive curves and sharper grades.

The evidence discloses without any question that that part of the railroad located in Illinois earned the following respective proportions of the entire earnings of the railroad for the respective years named:

1924.... 19.81 per cent.
1925.... 16.05 per cent.
1926.... 16.59 per cent.
1923.... 04.63 per cent.
1922.... no part of the earnings, as there was a deficit in Illinois.

If we average this percentage over the four years, 1923, 1924, 1925, and 1926, we find that Illinois for those four years averaged 14.27 per cent. of the earned operating income of the entire railroad system. If we take the average for five years, including 1922, we find the Illinois property earned 11.41 per cent. annually of the earned income. The proportion earned by the Illinois portion of the railroad in 1927 is immaterial, except in so far as it may tend to verify the calculations made for previous years. On the undisputed evidence, the proportion of the earned income earned in Illinois in 1927 was 14.50 per cent. If we adopt the average proportion earned by the property in Illinois in 1924, 1925, and 1926 as representative, remembering that the total value of the property as fixed by a capitalization of the earnings is $53,293,766, we find Illinois' percentage of that capitalized value would be $7,780,799. Adopting 47 per cent. as the maximum approved rate of assessed values in Illinois, we have resulting an aggregate assessment of $3,656,975. If, instead of making our calculation upon the basis of the actual proportion of the earnings earned by that part of the property located in Illinois, we adopt the percentage of the mileage owned by defendant located in Illinois, 16.77 per cent., we find the capitalized value based upon the earnings allocated to Illinois to be $8,837,364; 47 per cent. of this produces a correct assessment of $4,173,561.

If we accept the average per cent. of the total earnings earned in Illinois for the years 1923, 1924, 1925, and 1926 as representative of the value of the Illinois portion of the road, we find that the average earnings for the entire system for each of those four years, being $3,318,712, the average share of the operating income for each of those four years apportionable to Illinois is 14.27 per cent., or an average annual earning of $473,-580. This capitalized at 6 per cent. produces a value of $7,693,004, furnishing upon the 47 per cent. basis an assessment of $3,615,711.

It should be noticed that defendants in their figures allocate to Illinois a larger per cent. of the operating income of the railroad, but upon an analysis of the evidence it is

obvious that the defendants' contentions in that respect cannot be substantiated, for the reason that they have ignored the undisputed deductions from net operating income, consisting of taxes, rentals, and other deductible items. These are clearly shown by plaintiff's evidence, and are not in any way controverted. Furthermore, the percentages, suggested by defendants, are largely theoretical. Apparently they did not take into consideration the distance which freight and passengers moved within the state of Illinois, as compared with the movement in other states.

If, instead of considering the entire earnings of the road, we consider the earnings of that part of the road located in Illinois, we find that for the five years 1922, 1923, 1924, 1925, and 1926 the actual operating income earned in Illinois was $372,111 per year. If we exclude the year 1922, when there was a deficit, and consider the years 1923, 1924, 1925, and 1926, the four years immediately prior to the making of the assessment, we find an average operating earning in Illinois of $474,615 per year. Capitalizing the average earnings upon a five-year basis— that is, the average annual of $372,111, upon a 6 per cent. basis—we have a valuation in Illinois of $6,201,850, and an assessed value of 47 per cent. thereof of $2,914,869. If we capitalize the earnings upon the average of the four-year period, excluding 1922, the average being $474,615 per year, we have a value of the property in Illinois of $7,910,-250, and an assessed value of 47 per cent. thereof amounting to $3,717,817. The proper proportion to be considered in capitalizing earnings is undoubtedly the proportion of the railroad operated in Illinois, rather than the proportion of the railroad there owned.

If we attempt to determine the value from the value of its securities, we find that the face value of bonds and trust obligations of plaintiff is $35,223,000. There are 60,168 shares of capital stock outstanding. The undisputed evidence shows it is earning approximately $30 per share from the operating income of the entire system. There is some testimony in the record that the stock in such situation should be of the fair cash market value of $290 per share. The railroad company is bound to pay only the face of its bond and trust obligations. If we compute the entire value of the road upon the value of its securities, therefore, we have a total of:

Bonds and trust obligations............. $35,223,000 00
Market value of capital stock, as determined by operating income........... 17,448,720 00

Total value of securities................. $52,671,720 00

If we allocate to Illinois that portion of said total as is represented by the proportion of the entire road owned in Illinois, we must allocate 16.67 per cent. of the securities value to this state. The result gives us $8,833,047 as the value of that portion of the property located in Illinois. If 47 per cent. of the full value exceeds the valuation of other property in Illinois for taxing purposes, we find the assessed valuation should be $4,151,532.

In State Railroad Tax Cases, 92 U. S. 575, 23 L. Ed. 663, the court, in discussing the evidence of the current market value of stocks and bonds in determining the taxable value of railroad properties, said: "It is therefore obvious that, when you have ascertained the current cash value of the whole funded debt, and the current cash value of the entire number of shares, you have, by the action of those who above all others can best estimate it, ascertained the true value of the road, all its property, its capital stock, and its franchises; for these are all represented by the value of its bonded debt and of the shares of its capital stock." In this connection we should notice that tax-exempt property and noncarrier property should be deducted from the market value of securities. This is apparent from the fact that the Illinois taxing authorities may tax only the physical property in Illinois. No property of an interstate road situated elsewhere can be taken into account by the commission, unless it can be seen in some plain and fairly intelligible way that it adds to the value of the road and the rights exercised within the state. See Fargo v. Hart, 193 U. S. 490, 24 S. Ct. 498, 48 L. Ed. 761.

The defendants produced a witness who testified as to certain calculations he had made from certain figures in the office of the Interstate Commerce Commission, using a purely theoretical formula for the purpose. He took from the records of the Commission the cost of reproduction of the railroad equipment and rolling stock of plaintiff, less depreciation as of June 30, 1915. From this he deducted the actual retirements, as reported by the company to the commission, and to it he added the additions as reported by the company from time to time. He did not examine the property with a view of determining its actual value, or the actual depreciation thereon. He appreciated by straight line or curved methods the already depreciated cost of reproduction of the items inventoried in 1915 by some times as much as 224 per cent. He appreciated each of the additions by arbitrary percentages, and then depreciated each of the appreciated values by

certain straight line or curved formulæ, without any personal knowledge or examination of the property itself, and without any basis for determining the cost at the present time, less reproduction, other than the theoretical formulæ adopted by him. The witness furnishes no evidence as to whether any of the machinery, locomotives, or other mechanical equipment or rolling stock has become less valuable because of obsolescence, or because of less efficiency as compared with more modern machinery. So much is left to the realm of speculation that the court does not have any reliable evidence as to the cost of reproduction of the different units of the plaintiff's property in April, 1927, less the actual depreciation thereof.

Evidence of cost of reproduction, less the actual depreciation of the property, is always competent and desirable evidence upon the question of value, if the witness who furnishes the same has actual knowledge of the cost units which go into its reproduction, and of the actual condition of the property so far as depreciation is concerned. But this court will not accept with any credence the theories of a witness, as to costs, which attempt to set up a depreciated cost of reproduction in 1915, then to appreciate the same, then to depreciate again, and to appreciate all additions, and then to depreciate them, and thus to arrive at a purely hypothetical value in 1926, without any showing of any knowledge of construction or property units.

There is unnecessary confusion in the remarks of different courts as to so-called differences between values for taxing purposes, for rate-making purposes, and for other purposes. To the mind of this court, value is always the same. The difficulty lies, not in the fact that there should be different methods of valuation for the different purposes mentioned, but in the fact that tax authorities quite generally do not strictly follow the rules made for them by the Legislature. Although the statutes of the state of Illinois (Smith-Hurd Rev. St. 1927, c. 120, § 297) direct tax authorities to tax properties for full value, it is not contended by either of the parties in this case that any of the tax authorities have assessed any property within the state of Illinois at more than 60 per cent. of its value. If all property were at all times assessed at its full value, each particular piece of property in the state would pay its proper proportionate share of the taxes, and there would not creep into briefs of lawyers and decisions of courts decisions or remarks to the effect that valua-

tions for tax purposes are different from valuations for rate-making purposes.

■ After a careful consideration of all the evidence, ignoring the commission's finding that the full value of the property was $6,-797,999, extending to defendants every presumption possible in support of their position and in favor of the assessment, the court is convinced that the utmost limit that can be fixed upon the actual value of plaintiff's property located in and apportionable to the state of Illinois at the time the assessment was made is the sum of $8,599,830, and that if the tax commission had assessed said property at not to exceed the maximum of other assessments in Illinois at 47 per cent. it could have legally placed upon plaintiff's property for taxing purposes an assessed value of not to exceed $4,041,920. The actual assessment was $6,797,999; so there was an overassessment of $2,756,079. It appears that of the total assessment $66,586 was upon certain local properties the tax upon which has been fully paid. Proper consideration of this item, therefore, must be given in the formal decree herein.

The Supreme Court of Illinois in People's Gaslight & Coke Co. v. Stuckart, 286 Ill. 164, 121 N. E. 629, said: "The great central and dominant idea of the Constitution is uniformity of taxation, and no power exists or should exist in any corporate authority to go counter to this command of the fundamental law. Therefore one person cannot be compelled to pay a greater proportion of taxes, according to the value of his property, than another, and where assessors have disregarded the injunction of the law, and made an assessment of property far below its real cash value, their misconduct must also follow the principle of uniformity, and their assessments of all persons must be at the same proportional value." And in People v. Keokuk & Hamilton Bridge Co., 287 Ill. 246, 122 N. E. 467, the court said: "Where an assessment shows a very great disparity and discrimination, which could not reasonably have arisen from an error of judgment, the courts will give relief."

No difference in judgment as to the value of the property between the tax commission and the court can be sufficient to impeach the valuation of the board. But we must recognize likewise that an overvaluation may be so excessive, and made under such circumstances, as to justify only the conclusion that it was not honestly made, and was known to be excessive, and that the willful disregard by members of the commission of their con-

stitutional duty for the purpose of producing a result which would not otherwise be produced is properly urged against an assessment as fraud. See People's Gaslight & Coke Co. v. Stuckart, 286 Ill. 164, 121 N. E. 629; Raymond v. Chicago Union Traction Co., 207 U. S. 20, 28 S. Ct. 7, 52 L. Ed. 78, 12 Ann. Cas. 757; Pacific Hotel Co. v. Lieb, 83 Ill. 602; People v. Keokuk & Hamilton Bridge Co., 287 Ill. 246, 122 N. E. 467.

In People v. C., B. & Q. R. R. Co., 300 Ill. 399, 133 N. E. 325, Mr. Justice Carter said: "Taxing authorities have no justification in withdrawing any property from the protection of the constitutional principle of uniformity of taxation, as uniformity of taxation is required under the Constitution, and that a person cannot be compelled to pay a greater proportion of taxes, according to the value of his property, than another property owner. * * * While it is true that error in the exercise of an honest judgment in fixing the value of property will not invalidate the tax, it is also true that an arbitrary violation of the rule of uniformity is an invasion of constitutional right and will not be tolerated."

The Supreme Court of the United States, in Wilson v. Illinois Southern Railway Co., 263 U. S. 574, 44 S. Ct. 203, 68 L. Ed. 456, approved the method here adopted of attacking such assessment, and in support of the same doctrine are the cases of Hanover Fire Insurance Co. v. Harding, 272 U. S. 494, 47 S. Ct. 179, 71 L. Ed. 372, 49 A. L. R. 713; Sioux City Bridge Co. v. Dakota County, Nebraska, 260 U. S. 441, 43 S. Ct. 190, 67 L. Ed. 340, 28 A. L. R. 979; Greene v. L. & I. R. R. Co., 244 U. S. 499, 37 S. Ct. 673, 61 L. Ed. 1280, Ann. Cas. 1917E, 88. In Munn v. Des Moines National Bank, 18 F. (2d) 269 (C. C. A. 8), in a similar case the court said: "It [the court] accordingly applied to these cases the established and approved remedy for this wrong; it enjoined the treasurer of the county from collecting the excess of these taxes on the property of the shareholders of these banks above the amounts of the taxes·that would have been levied here, if the taxing officers had not discriminated against this property. That remedy is prescribed and fixed by the decisions of the Supreme Court in Sioux City Bridge Company v. Dakota County, Nebraska, 260 U. S. 441, 43 S. Ct. 190, 67 L. Ed. 340, 28 A. L. R. 979; Raymond v. Chicago Union Traction Co. [297] 207 U. S. 20, 28 S. Ct. 7, 52 L. Ed. 78, 12 Ann. Cas. 757; Cummings v. National Bank, 101 U. S. 153, 25 L. Ed. 803.''

Bearing in mind these rules, and remembering that the commission itself found the full value of the company's Illinois property to be $6,797,999, and fixed the assessed value at 100 per cent. thereof, in the face of its own record that property in Illinois was assessed between 40 and 50 per cent. generally, and in the face of the fact, as disclosed by the record, that in Illinois other assessed values do not exceed 47 per cent., it is impossible to conceive of any reason for the resulting obvious discrimination against the plaintiff. On the face of the record the commission assessed the plaintiff's property at 100 per cent. of its actual value. Upon the independent investigation made by this court, it is clear that the assessment made by the commission is in excess of 79+ per cent. of the property's value. If gross overvaluation, entirely out of proportion with other assessments, is evidence of fraud, we cannot escape the conviction in this case that the commission, without any justification, assessed plaintiff's property far beyond the rate at which other properties were assessed in Illinois. The court is driven to the inevitable conviction the assessment was fraudulent, and should be set aside as to everything over and above the sum of $4,041,920. It is clear that the difference was an intentional discrimination, and constituted such an injury to plaintiff as violates its rights under the national Constitution, and as a court of· equity is competent to redress.

Defendants contend that the valuations placed by plaintiff upon its property in its report to the tax commission were so low as to amount to fraud. With that question this court is not now concerned. We might observe that it seems to be a human failing to put low valuations upon property when men are submitting it for assessment. But this trait springs into active being largely because of the common practice upon the part of taxing bodies of failure to assess property for full value for tax purposes, as required by law, and their proneness to make assessments at only a fraction thereof. Thus taxing authorities, by failure in their duty, invite bidding by property owners to obtain the lowest assessment possible.

Defendants complain that there is no evidence as to assessment of other railroads before the court. Such fact is immaterial. The court is now concerned only with the question of whether this particular plaintiff has been discriminated against, not with the question whether all railroads have been discriminated against. The question here determined is that the particular party now com-

plaining has been taxed more than its proportionate share, as compared with what other property is generally taxed in Illinois. It would be no defense to this action to show that the tax commission is discriminating against other railroads.

There will be a decree in conformity with this opinion.